1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10    ALBERT LIZARRAGA,

11              Petitioner,                 No. CIV S-01-1062 MCE JFM P

12         vs.

13    CHERYL K. PLILER, et al.,

14              Respondents.            <u>FINDINGS & RECOMMENDATIONS</u>

15    _____/

16              Petitioner is a state prisoner proceeding pro se with an application for a writ of

17    habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 1997 conviction on

18    charges of second degree murder, assault with intent to commit rape, false imprisonment, assault

19    by means of force likely to cause great bodily injury, and forcible rape.  He seeks relief on the

20    grounds that: (1) the prosecutor committed misconduct (prosecutorial vindictiveness); (2) the

21    trial court erred when it denied petitioner's motion to recuse the prosecutor; (3) his speedy trial

22    rights were violated; (4) the trial court erred when it denied petitioner's motion for severance; (5)

23    the trial court erred when it denied petitioner's motion for substitution of counsel; (6) the trial

24    court erred when it denied petitioner's motions for a mistrial and a new trial; (7) there was

25    insufficient evidence to support his murder conviction; and (8) the trial court erred when it

26    excluded evidence of third party culpability.  Upon careful consideration of the record and the

                                        1

1    applicable law, the undersigned will recommend that petitioner's application for habeas corpus

2    relief be denied.

3                           PROCEDURAL AND FACTUAL BACKGROUND[1]

4              The San Joaquin County District Attorney charged the [petitioner]
        by amended information on March 6, 1997, with the January 1996
5        murder of Kenneth Minier; the January 1996 assault with intent to
        commit rape, attempted rape, kidnapping, false imprisonment,
6        battery with serious bodily injury, and assault by means of force
        likely to produce great bodily injury of Michelle; and two August
7        1992 forcible rapes of Jennifer.  The information also alleged as
        strikes that the [petitioner] was convicted of robbery in 1976 and
8        1986.

9              During a jury trial, the kidnapping charge was dismissed at the
        request of the prosecution.  The jury acquitted the [petitioner] of
10       the attempted rape and the battery with serious bodily injury of
        Michelle and convicted the [petitioner] of the second degree
11       murder of Kenneth Minier, assault with intent to commit rape,
        false imprisonment, and assault by means of force likely to produce
12       great bodily injury of Michelle, and two forcible rapes of Jennifer.
        The jury also found true the two prior robbery convictions.

13
              The trial court sentenced the [petitioner] as a third striker.  It
14       imposed a term of 45 years to life (triple the minimum term) for
        second degree murder.  The court added to this term a consecutive
15       25 years to life for the assault with intent to commit rape for a total
        indeterminate term of 70 years to life.  As to the determinate term,
16       the court imposed the upper term of eight years for one of the
        rapes.  The court imposed a consecutive two years, one-third of the
17       middle term, for the other rape, for a total determinate term of 10
        years.  The court imposed sentence on the other charges on which
18       the [petitioner] was convicted but stayed those terms pursuant to
        Penal Code section 654.  Accordingly, the total term of
19       imprisonment in state prison is 80 years to life.

20                                            * * *

21       *August 1992 Rapes of Jennifer*

22             In August 1992, 18-year-old Jennifer lived with a family in
        Manteca.  The [petitioner], who was 40 years old at the time, was a
23       friend of the family and visited the residence on a day during that
        month.  That evening, Jennifer decided to walk to the store to get

24

25             [1] This statement of facts is taken from the December 17, 1999 opinion by the California
        Court of Appeal for the Third Appellate District (hereinafter Opinion), at pgs. 3-8, appended as
26       Exhibit 2 to Respondent's Answer, filed on February 14, 2002.

                                               2

some groceries.  The [petitioner] offered to drive her there.  She accepted.  They got into the car and the [petitioner] did not drive to the store.  Instead, he drove in the opposite direction.  This scared Jennifer, so she tried to get out of the car.  The [petitioner] prevented her from getting out by accelerating.  He drove out of the neighborhood and turned down a dirt road into an orchard.

After stopping the car, the [petitioner] went around to the passenger side of the car and grabbed Jennifer.  He threw a towel down on the ground and told her to take off her clothes.  Because of the force he was using and her fear he would kill her, she complied.  He took off his own clothes and forced her down onto the towel, holding her by the throat, mouth, and shoulders.  She could not breathe and felt like she was losing consciousness.  While he was holding her down, he penetrated her but did not ejaculate.

The [petitioner] told her to get up and put her clothes back on, then forced her back into the car.  He drove to another orchard, where he told Jennifer to get out of the car.  When she tried to escape, he grabbed her by the hair.  The struggle apparently excited the [petitioner].  He put the towel down again, removed her clothing, except for her top, and opened his pants.  He again penetrated her, and this time ejaculated.  After the second rape, the [petitioner] drove Jennifer back to her residence.

The [petitioner] claimed the intercourse was consensual, adding: Jennifer went with him to get something at his house.  She suggested they go for a ride, and he drove to the orchards.  She initiated sexual relations twice.  On the way back to the residence, she became upset with him because he would not let her drive his car.

*January 1996 Crimes Against Michelle and Kenneth Minier*

The [petitioner] lived in Manteca with Kenneth Minier, who was 63 at the time of his death, off and on for many years in a father-son type relationship, although they were not related.  In 1995, the [petitioner] was seen at Minier's residence frequently.  In September 1995, Minier obtained a restraining order against the [petitioner].  In the application for the restraining order, Minier stated the [petitioner] was stealing and pawning Minier's property.  When Minier attempted to throw him out, the [petitioner] made threats, such as threatening to burn down the house.  The [petitioner] could not be trusted.

Minier was afraid of the [petitioner] because the [petitioner] threatened to hurt him.  His fears, as observed by a neighbor in whom Minier confided, escalated in the latter part of 1995.  Despite the restraining order, Minier, who was an "easygoing" man, allowed the [petitioner] to return to the residence.  On

December 31, 1995, Minier called 911 concerning his problems with the [petitioner].

In the early morning hours of January 2, 1996, Michelle was walking home from her boyfriend's house when she accepted a ride from the [petitioner].  While they talked and drank whiskey, the [petitioner] drove out to the country.  Michelle asked the [petitioner] to take her to her brother's house.  He did so, but no one was home.  The [petitioner] insisted that Michelle come to his house, the Minier residence, for a drink, but she wanted to go home.  She finally agreed to go to his house.  When they arrived, the [petitioner] grabbed her arm and led her to the front door.  He unlocked the door, and they went inside.  Once in the house, the [petitioner] gave Michelle some green liquor to drink.

After conversing with the [petitioner] for about 30 minutes, Michelle started down the hallway to the bathroom.  The [petitioner] followed, grabbed her by the hair, and began hitting her face.  As the beating continued, Michelle fell to the floor, and the [petitioner] began choking her with the gold chains she was wearing around her neck.  The [petitioner] dragged her into his bedroom and onto his bed while they struggled.  When the [petitioner] let go of her chain and stopped choking her, she said, "What is it you want from me?  Sex or what?"  He replied that he did, so she took off her clothes.  The [petitioner] turned around and began walking toward the kitchen.  Michelle saw her chance to escape and ran out of the house naked.  A woman saw her and gave her a ride home.

At home, Michelle called the police.  An officer came to her home, and Michelle reported what had happened.  The Manteca Police Department obtained a search warrant for the Minier residence.  Officers went to the residence on the afternoon of January 2, 1996, to search for evidence of the attack on Michelle.  They observed no signs of forced entry into the house, and the house was locked.  When no one responded to their knock and notice, they kicked down the door.  Once inside, they not only found evidence of the attack on Michelle - her gold chain and her clothing - they also found the dead body of Kenneth Minier, lying on his bed under a heated electric blanket.

An investigation revealed a ligature mark on Minier's neck from strangulation.  A black and orange rope was found in the room, and fibers from the rope were on Minier's bed near his head.  Fibers from the rope were also found in the [petitioner's] bedroom and in the hallway between the rooms.

Because Minier's body was found under a heated electric blanket, it was difficult to determine the exact time of death.  Expert estimates ranged anywhere from the evening of January 1, 1996, to the morning of the next day.

4

The [petitioner] was arrested during the evening on January 2, 1996. He was bleeding from a cut on the right side of his face and from injuries to his hands and wrists.

The [petitioner] asserted he did not remember what happened on January 2, 1996, and with Michelle until he had a "spiritual experience" in jail. An angel appeared to him, holding car keys. He then remembered that in his travels with Michelle she had his keys and when she gave them back one of the keys was missing. The [petitioner] did not testify concerning details of what happened with Michelle at the Minier residence.

*Prior Bad Acts*

In 1973, the [petitioner] gave a ride in his car to a 17-year-old friend, Lucy. When the [petitioner] did not stop the car where she expected him to, she tried to get out at a stop sign. The [petitioner] grabbed her arm, preventing her from getting out of the car, and he drove out into the country. He pulled into a field, where he grabbed her and pushed her down onto the front seat. She began to scream, but he choked her until she stopped. The [petitioner] pulled her pants off and pushed her into the back seat. He tried to penetrate her, but was unable to because he did not have an erection. Another car pulled off the road, so the [petitioner] jumped back into the front seat and drove back to town and left Lucy at her sister's house. The [petitioner] was convicted of misdemeanor battery as a result of a plea bargain.

In 1989 or 1990, during the summer, the [petitioner] took 12- or 13- year-old Ramona to get beer at a store. Afterward, he took her to an orchard instead of taking her home. There, he pulled her into the back seat, hit her, and took off her clothes. The [petitioner] pulled down his own pants and tried to penetrate Ramona, but he could not become erect. The [petitioner] became angry and hit her again. He continued to attempt to penetrate her but was not successful. Finally, he stopped his attempts and took Ramona home. She did not report the incident to the authorities until she was questioned after the [petitioner's] 1996 crimes.

(People v. Lizarraga, et al., slip op. at 3-8.)

ANALYSIS

I. Standards for a Writ of Habeas Corpus

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

/////

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents "if it 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases', or if it 'confronts a set of facts that are materially indistinguishable from a decision'" of the Supreme Court and nevertheless arrives at different result. Early v. Packer, 573 U.S. 3, 8 (2002) (quoting Williams v. Taylor, 529 U.S. 362, 405-406 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. Williams, 529 U.S. at 413. A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

The court looks to the last reasoned state court decision as the basis for the state court judgment. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d). Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

/////

II.  Petitioner's Claims

    A.  <u>Prosecutorial Misconduct (Vindictive Prosecution)</u>

        Petitioner's first claim is that his right to due process was violated when the

prosecutor retaliated against him by amending the original information to add the previously

dismissed 1992 rape charges.  The California Court of Appeal fairly described the background to

this claim as follows:

> In 1993, during a single incident, the [petitioner] and his father
> were both shot by Robert Menchaca.  The [petitioner's] father died
> as a result of the wounds.  The case against Menchaca was
> assigned to Deputy District Attorney George H. Dunlap, Jr., and
> the [petitioner] was to be a witness against Menchaca.  However,
> when the [petitioner] was arrested for the charges involving Minier
> and Michelle, Dunlap agreed to a plea bargain with Menchaca to a
> manslaughter conviction, due to the [petitioner's] credibility
> problems.
>
> The district attorney filed a complaint against the [petitioner] in
> January 1996, charging him with the attempted rape of Michelle
> and the murder of Minier.  In June 1996, after the Menchaca matter
> was plea bargained to a manslaughter, the district attorney
> amended the complaint in this action to allege the two 1992 rapes
> of Jennifer.  The [petitioner] asserts the charges for the 1992 rapes
> were added because the [petitioner] refused to testify against
> Menchaca without a deal as to the charges involving Minier and
> Michelle.  Based on this assertion, he contends the 1992 rape
> charges should have been dismissed as a remedy for vindictive
> prosecution.

(Opinion at 13.)

        The state appellate court concluded that petitioner had waived this claim on

appeal because of his failure to properly raise it in the trial court.  (<u>Id.</u> at 13-15.)  The court also

opined, however, that the claim should be denied on the merits.  The court explained its

reasoning as follows:

> Even if we were to conclude the [petitioner] properly raised the
> issue of vindictive prosecution in the superior court, we would
> reject his claim.  The prosecution did not try the 1992 rapes of
> Jennifer earlier because she refused to testify.  When the
> prosecution filed the charges relating to the 1996 crimes, she
> changed her mind and decided to testify.  The statute of limitations
> had not run.  Any prosecutor would have been duty bound to

7

1   proceed on the 1992 rapes.  Therefore, the allegation of vindictive
2   prosecution is without merit.

3   (Id. at 15-16.)

4         It is well established that a prosecutor violates a criminal defendant's due process

5   rights if he exacts a price for a defendant's exercise of a clearly established right or punishes a

6   defendant for doing what the law plainly entitles him to do.  See United States v. Goodwin, 457

7   U.S. 368, 372 (1982); Blackledge v. Perry, 417 U.S. 21, 28-29 (1974).  "To punish a person

8   because he has done what the law plainly allows him to do is a due process violation of the most

9   basic sort, and for an agent of the State to pursue a course of action whose objective is to

10  penalize a person's reliance on his legal rights is 'patently unconstitutional.'"  Bordenkircher v.

11  Hayes, 434 U.S. 357, 363 (1978) (citations omitted).  To establish actual prosecutorial

12  vindictiveness, a defendant must show, through objective evidence, that the prosecutor acted

13  with genuine animus toward the defendant and the defendant would not have been prosecuted but

14  for that animus.  See Goodwin, 457 U.S. at 380 n. 12.  In order to make the required showing, a

15  defendant must demonstrate that additional charges were brought "solely to 'penalize' the

16  defendant and could not be justified as a proper exercise of prosecutorial discretion."  Id.

17        If a defendant is unable to prove an improper motive with direct evidence, he may

18  present circumstances from which an improper vindictive motive may be presumed.  Blackledge,

19  417 U.S. at 27.  However, to invoke such a presumption, the circumstances must "pose a realistic

20  likelihood of 'vindictiveness.'"  Id.  A presumption of vindictiveness is rarely applied to a

21  prosecutor's pretrial decisions because "a prosecutor should remain free before trial to exercise

22  [that] broad discretion entrusted to him to determine the extent of the societal interest in

23  prosecution."  Goodwin, 457 U.S. at 382.  Indeed, a prosecutor's charging decision is

24  presumptively lawful.  See Bordenkircher, 434 U.S. at 364; United States v. Armstrong, 517 U.S.

25  456, 464 (1996).  Accordingly, "a change in the charging decision made after an initial trial is

26  completed is much more likely to be improperly motivated than a pretrial decision."  Goodwin,

8

1  457 U.S. at 381.  When a presumption of vindictiveness is established, the burden shifts to the

2  government to present objective evidence justifying its conduct.  Id. at 374.

3        In his claim before this court, petitioner attempts to establish a vindictive motive

4  for the addition of the 1992 rape charges by alleging that the prosecutor "re-filed 1996 [sic]

5  dismissed rape allegations after telling defense attorney "He fucked Mr. Lizarraga."  (Am. Pet. at

6  5.)  In his claim on direct appeal, petitioner explained his theory as follows:

7       Menchaca's anticipated defense was "reasonable belief in the need
     to self-defend."  Menchaca's attorney made known his intent at

8       Menchaca's trial to establish appellant's violent temperament,
     including testimony about the January, 1996 offenses, in order to

9       buttress Menchaca's knowledge of appellant's violent history, in
     support of Menchaca's self-defense theory.  Appellant's then-

10       attorney, Tony Agbayani, would not permit appellant to be
     questioned about charged crimes for which appellant had not yet

11       been tried, and Agbayani informed Dunlap that appellant would
     exercise his Fifth Amendment right against self-incrimination,

12       therefore would be "unavailable" as a witness, although appellant's
     testimony from Menchaca's preliminary hearing could be used by

13       the prosecution.

14       But as appellant's availability and crecibility as a witness in the
     Menchaca case were compromised, in April, 1996 Dunlap entered

15       into a plea bargain with Menchaca in which the latter pled guilty to
     manslaughter.

16

17  (Answer, Ex. 1 at 55.)  In state court, petitioner argued that the prosecutor blamed petitioner for

18  forcing him to reduce the charges against Mr. Menchaca.  (Id. at 55-56.)  Petitioner stated that the

19  prosecutor told petitioner's then-attorney that "he was going to screw [petitioner] for messing up

20  his case" and that "he had 'fucked' [petitioner].  (Id. at 56.)  Petitioner also argued that the

21  situation presented in this case was more akin to a post-conviction attempt to punish him for

22  refusing to testify at Menchaca's trial than a pretrial decision as to what charges to bring.  (Id. at

23  66-67.)  In this regard, he contended that the dismissal of the 1992 charges because of the

24  victim's refusal to testify was tantamount to a conviction.  (Id.)

25        After a review of petitioner's claim of vindictive prosecution made in this court

26  and in the state courts, it appears that petitioner is arguing the prosecutor improperly exacted a

1  price (the addition of the previously dismissed 1992 rape charges) in retaliation for petitioner's

2  exercise of his right not to testify against Machaca unless he received a favorable plea bargain.

3  Petitioner may also be alleging that the prosecutor's motive was to punish him for making

4  himself an incredible witness by virtue of the crimes he committed against Minier and Michelle.

5  His claim fails.

6           Petitioner has failed to demonstrate that the prosecutor's decision to charge him

7  with the 1992 rapes was motivated by actual vindictiveness.  Specifically, petitioner has failed to

8  show that the prosecutor added the 1992 rape charges to the indictment against petitioner

9  "solely" to punish petitioner for his failure to testify in the Menchaca case or that the addition of

10  those charges "could not be justified as a proper exercise of prosecutorial discretion."  Goodwin,

11  457 U.S. at 380 n.12.  As explained by the state appellate court, the charges against petitioner

12  were justified by the fact that the victim changed her mind and agreed to testify against petitioner

13  after it was clear that his criminal behavior was continuing and, indeed, had seriously escalated.

14  Under these circumstances, virtually any prosecutor would have pursued these serious charges

15  against a criminal defendant.  Regardless of whether the prosecutor was unhappy with the fact

16  that petitioner refused to testify against Menchaca absent a favorable plea agreement or that

17  petitioner had committed crimes which destroyed his credibility for the Menchaca trial, he had

18  valid prosecutorial reasons to charge petitioner with the two rapes he committed in 1992.

19           Petitioner has also failed to make a showing sufficient to raise a presumption of

20  vindictiveness or to overcome the presumption of prosecutorial regularity.  First, contrary to

21  petitioner's argument, this court does not find the prosecutor's decision to charge petitioner with

22  the previously dismissed rape charges as a post-conviction action.  Rather, the prosecutor made a

23  pretrial decision to charge petitioner with the 1992 rape charges because the victim changed her

24  mind and decided to testify.  Further, the circumstances surrounding the addition of the 1992 rape

25  charges do not "pose a realistic likelihood of 'vindictiveness.'"  Blackledge, 417 U.S. at 27.

26  /////

1   Rather, they reflect the fact that the 1992 rape charges could now be successfully prosecuted after

2   the victim's change of mind.

3           This court concludes that the facts of this case are more akin to those in

4   Bordenkircher and Goodwin, in which the United States Supreme Court rejected prosecutorial

5   vindictiveness claims arising from prosecutors' decisions to indict defendants on more serious

6   charges after the defendants had rejected plea bargains.  The Supreme Court reasoned that in the

7   "give-and-take" of plea bargaining, there is no retaliation so long as the defendant remains free to

8   accept or reject the plea.  Bordenkircher, 434 U.S. at 363.  That was the case here.  Although the

9   prosecutor may have harbored animosity against petitioner for the way things turned out with the

10  Menchaca trial, his decision to charge petitioner with the 1992 rapes was clearly a valid exercise

11  of prosecutorial discretion.  The decision of the California Court of Appeal rejecting petitioner's

12  claim of vindictive prosecution is not an unreasonable interpretation of the United States

13  Supreme Court cases cited above.  Accordingly, petitioner's claim of prosecutorial misconduct

14  should be denied.

15      B.  Motion to Recuse

16          Petitioner's next claim is that his constitutional rights were violated when the trial

17  court denied his motion to recuse the deputy district attorney who tried his case.  He explains:

18  "Deputy Dunlap plea-bargained Menchaca murder case in which petitioner was not only a victim

19  but the only eye witness and amended the complaint against petitioner to alleged [sic] the 1992

20  rape case." (Am. Pet. at 5.)  Petitioner appears to be claiming that the trial court should have

21  granted his recusal motion for two reasons: (1) the prosecutor harbored bias against petitioner

22  because he refused/was unable to testify as a prosecution witness in the Menchaca case; and (2)

23  the prosecutor had a conflict of interest because he was attempting to use petitioner as a witness

24  in the Menchaca case while at the same time prosecuting him for criminal acts.  (See Answer,

25  Ex. 1 at 74-92.)

26  /////

11

1        The California Court of Appeal denied this claim on the grounds that it was not

2   properly raised in the trial court.  The court explained its reasoning as follows:

3        In the superior court, the [petitioner] moved twice to recuse Dunlap
         because he intended to call him as a witness.  The trial court denied

4        the motion.  On appeal, the [petitioner] contends that court abused
         its discretion in denying the motion because Dunlap was biased

5        against the [petitioner] and because Dunlap had a conflict of
         interest arising from the [petitioner's] status as a witness in another

6        case Dunlap prosecuted.  As can be seen from this brief summary,
         the [petitioner] here seeks to establish error in the trial court's

7        denial of the recusal motions based on two grounds not asserted in
         the superior court, that is, perceived bias and conflict of interest.

8        These two new assertions fail because, in the trial court, he sought
         recusal solely based on Dunlap's potential status as a witness.

9                                  * * *

10

11       "The rule is well settled that the theory upon which a case is tried
         must be adhered to on appeal.  A party is not permitted to change

12       his position and adopt a new and different theory on appeal.  To
         permit him to do so would not only be unfair to the trial court, but

13       manifestly unjust to the opposing litigant."  (citation omitted).
         Defense counsel at trial chose not to rely on the grounds urged on

14       appeal and, therefore, Judge Grande had no occasion to consider
         them as independent grounds for recusing Dunlap.  Since the

15       [petitioner] does not reassert on appeal his claim that Dunlap
         should have been recused because he was a potential defense

16       witness, we need not consider whether Judge Grande properly
         denied the motion to recuse on that ground.

17  (Opinion at 16, 20.)  The California Supreme Court summarily denied petitioner's claim in this

18  regard on petition for review.  (Answer, Ex. 3.)

19       Respondent argues that this claim should be denied on the merits.  He does not

20  argue that the claim is procedurally barred and has therefore waived any such defense.  See

21  Bennett v. Mueller, 322 F.3d 573, 584-86 (9th Cir. 2003).  Because the California courts denied

22  petitioner's claim on procedural grounds, there is no state court decision on the merits of this

23  claim.  When it is clear that a state court has not reached the merits of a petitioner's claim, the

24  AEDPA's deferential standard does not apply and a federal habeas court must review the claim

25  de novo.  Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003); Killian v. Poole, 282 F.3d 1204,

26  1208 (9th Cir. 2002) (AEDPA standard of review not applicable because state court did not reach

1   the merits of petitioner's perjury claim).  See also Miranda v. Bennett, 322 F.3d 171, 178 (2d Cir.

2   2003) (§ 2254(d) requires deference only to state court adjudication on the merits and not to a

3   disposition on procedural or other grounds); Neal v. Puckett, 286 F.3d 230, 235 (5th Cir. 2002)

4   (en banc) (defining "adjudication on the merits" to be a substantive, rather than a procedural,

5   decision); Fisher v. Texas, 169 F.3d 295, 300 (5th Cir. 1999) (court declined to apply deferential

6   AEDPA standard because of state court's awareness of, and explicit reliance on, a procedural

7   ground to dismiss petitioner's claim).  Accordingly, this court will review de novo petitioner's

8   claim that his constitutional rights were violated when the trial court denied his recusal motion.

9   _____Prosecutors are "traditionally accorded wide discretion . . . in the enforcement

10   process."  Marshall v. Jerrico, Inc., 446 U.S. 238, 248 (1980).  Nonetheless,

> [a] scheme injecting a personal interest, financial or otherwise, into
> the enforcement process may bring irrelevant or impermissible
> factors into the prosecutorial decision and in some contexts raise
> serious constitutional questions.

14   Id. at 249-50.  Similarly, it has long been recognized that

> [a criminal prosecutor] is the representative not of an ordinary
> party to a controversy, but of a sovereignty whose obligation to
> govern impartially is as compelling as its obligation to govern at
> all; and whose interest, therefore, in a criminal prosecution is not
> that it shall win a case, but that justice shall be done. . . .  He may
> prosecute with earnestness and vigor -- indeed, he should do so.
> But, while he may strike hard blows, he is not at liberty to strike
> foul ones. It is as much his duty to refrain from improper methods
> calculated to produce a wrongful conviction as it is to use every
> legitimate means to bring about a just one.

21   Berger v. United States, 295 U.S. 78, 88 (1935).  Accord Young v. United States ex rel. Vuitton

22   et Fils S.A., 481 U.S. 787, 807 (1987).  These same principles apply with equal force to state

23   prosecutors.  Sheppard v. Rees, 909 F.2d 1234, 1238 (9th Cir. 1989).

24   Nonetheless, the standards of neutrality for prosecutors are not as demanding as

25   those applied to judicial or quasi-judicial officers.  Young, 481 U.S. at 810; Marshall, 446 U.S. at

26   249-50; Dick v. Scroggy, 882 F.2d 192, 197 (6th Cir. 1989).  This is because, unlike judges who

1    must always remain impartial, prosecutors are partisan advocates who are permitted to be zealous

2    in their enforcement of the law.  Marshall, 446 U.S. at 248-50; Dick, 882 F.2d at 197.

3    Accordingly, a petitioner claiming that a prosecutor bore a personal bias against him must

4    demonstrate that the fairness of his trial was affected and that he was thus prejudiced by the

5    prosecutor's involvement.  Dick, 882 F.2d at 196-97 ("[W]e are not persuaded that Mr. Dick's

6    prosecution by a Commonwealth Attorney who may have been less than disinterested constituted

7    an irregularity 'sufficiently fundamental' to justify our setting aside the conviction in this case.");

8    Gallo v. Kernan, 933 F. Supp. 878, 885 (N.D. Cal. 1996)(habeas relief denied where it was

9    claimed that the prosecutor demonstrated an improper personal and emotional bias against

10   petitioner by taking unprecedented actions, including visiting the victim in the hospital, attending

11   the victim's divorce proceedings and taking positions adverse to petitioner, that the prosecutor

12   had not taken in similar cases), aff'd, 141 F.3d 1175 (9th Cir. 1998).

13          Petitioner has failed to demonstrate that the prosecutor's alleged bias should have

14   led to his recusal by the trial court.  Even if the prosecutor was disappointed with the outcome of

15   the Menchaca case, petitioner has failed to show that the prosecutor's personal feelings affected

16   the fairness of his trial.  As discussed above, there is insufficient evidence that the prosecutor's

17   actions in charging petitioner with the 1992 rapes of Jennifer were the result of bias.  Instead, a

18   legitimate and unchallenged explanation for that decision is apparent from the record: the

19   victim's change of mind enabled the prosecutor to introduce evidence demonstrating that in 1992

20   petitioner committed acts constituting rape.  To the extent that petitioner faults the prosecutor for

21   failing to resolve his case by way of a plea agreement, his claim must fail.  Whether to offer a

22   plea bargain is an area in which prosecutors are accorded relatively unfettered discretion.

23   Weatherford v. Bursey, 429 U.S. 545, 561 (1977) ("[T]here is no constitutional right to plea

24   bargain; the prosecutor need not do so if he prefers to go to trial."); King v. Brown, 8 F.3d 1403,

25   1408 (9th Cir. 1993).  Petitioner is correct in his assertion that the Due Process Clause entitles a

26   criminal defendant to an impartial and disinterested tribunal.  See In re Murchison, 349 U.S. 133,

1 | 136 (1955) ("Fairness of course requires an absence of actual bias in the trial of cases").
2 | However, petitioner's failure to point to any unfairness in his trial attributable to prosecutorial
3 | bias is fatal to this claim.

4 |       Petitioner has also failed to demonstrate that the prosecutor had a conflict of
5 | interest because he intended to use petitioner as a witness in the Menchaca trial at the same time
6 | as he was prosecuting him for criminal acts.  Petitioner has cited no cases, and the court has
7 | found none, which hold that a prosecutor has a conflict of interest if he prosecutes a criminal
8 | defendant who is a prosecution witness in another criminal proceeding.  In fact, that scenario
9 | occurs frequently in criminal courts.  In any event, the record does not suggest that the prosecutor
10 | made improper use at petitioner's criminal trial of any information obtained in the Menchaca
11 | case.

12 |       Petitioner has failed to make a showing that the deputy district attorney who tried
13 | his case harbored such extreme personal bias or prejudice against him that his due process rights
14 | were violated.  He has also failed to demonstrate that a conflict of interest on the part of the
15 | prosecutor prevented him from receiving a fair trial.  Accordingly, the trial court's ruling denying
16 | his recusal motion on these grounds did not violate petitioner's constitutional rights.

17 |    C. <u>Speedy Trial</u>

18 |       Petitioner claims that the delay in prosecuting him for the 1992 rapes violated his
19 | rights to a speedy trial and due process.  (Am. Pet. at 6.)  The claim is stated, in full, as follows:
20 | "Trial court violated petitioner's right to a speedy speedy [sic] trial and due process under the
21 | Fourteenth Amendment.  The refiling and prosecuting three and one-half year old dismissed 1992
22 | rape charges."  (<u>Id.</u>)  In this claim, petitioner appears to be challenging the length of the delay
23 | between the dismissal in 1992 of the rape charges and their refiling three and one-half years later.
24 | He does not appear to be challenging any delay which may have occurred after the filing of
25 | charges in 1996.  In other words, petitioner's claim is that pre-indictment delay violated his
26 | constitutional rights.

The California Court of Appeal rejected this claim for the following reasons:

> The [petitioner] asserts the municipal court erred in denying his motion to dismiss based on violation of his speedy trial rights. There was no motion to dismiss made in the superior court, and there was no challenge in the superior court to any purported action the municipal court may have taken with respect to speedy rights. Since this appeal is a review of the superior court's judgment, review of the orders of the municipal court is beyond the scope of the appeal. (See part I, above.)
>
> A defendant may petition the superior court for a writ of mandate or prohibition when the municipal court denies a motion to dismiss based on denial of speedy trial rights. (See People v. Flores, (1987) 196 Cal.App.3d 475, 479-480.) The [petitioner] apparently made no effort by any means to obtain review of the municipal court order denying his motion to dismiss.
>
> The [petitioner] also asserts he moved in the superior court for mistrial based on violation of his speedy trial rights and that he subsequently filed a motion for new trial based on the claim that the loss of evidence concerning the 1992 rapes prejudiced his defense. The right to speedy trial, however, is deemed waived unless the defendant both objects to the date set and thereafter files a timely motion to dismiss. (People v. Wilson (1963) 60 Cal.2d 139, 146.) In the superior court, the [petitioner] did not move to dismiss based on a speedy trial violation. He is therefore deemed to have consented to the delay. (Ibid.) His contention on appeal that the delay with respect to the 1992 rape charges deprived him of his due process right to a speedy trial is without merit.

(Opinion at 20-21.) The California Supreme Court summarily denied petitioner's claim in this regard on petition for review. (Answer, Ex. 3.) Respondent defends this claim on the merits.

The Fifth Amendment due process clause protects against "oppressive" pre-indictment delay. United States v. Lovasco, 431 U.S. 783, 788 (1977). However, because of statutory safeguards in the form of statutes of limitation, "the Due Process Clause has a limited role to play in protecting against oppressive delay." Id. at 789. Courts must apply a two-part test to determine whether pre-indictment delay results in a denial of due process: (1) the defendant must prove actual, non-speculative prejudice from the delay; and (2) the length of the delay, when balanced against the reason for the delay, must offend those "fundamental conceptions of justice which lie at the base of our civil and political institutions." United States v. Sherlock, 962

F.2d 1349, 1353-54 (9th Cir. 1992) (citing <u>Lovasco</u>, 431 U.S. at 790).  Moreover, a petitioner

claiming pre-accusation delay "carries a 'heavy burden' of showing actual prejudice that is

'definite and not speculative.'" <u>United States v. Ross</u>, 123 F. 3d 1181, 1185 (9th Cir. 1997)

(citations omitted).  It is not enough to assert that the memories of witnesses have faded over

time (<u>Prantil v. California</u>, 843 F.2d 314, 318 (9th Cir. 1988), nor is it sufficient to assert that

testimony was lost if the expected content of that testimony was generally speculative and/or

cumulative.  <u>Ross</u>, 123 F.3d at 1186-87.  Unless actual prejudice can be demonstrated by the

petitioner, the reason for the delay in question need not be considered.  <u>Id</u>. at 1186.

　　　　　　In his "speedy trial" claim before this court, petitioner does not describe any

prejudice suffered from the three and one-half year delay between the dismissal of the rape

charges in 1992 and their refiling in 1996.  During argument on his unsuccessful motion for

mistrial in the Superior Court, petitioner's counsel argued that substantial evidence, including

photographs, items seized from petitioner's car, and clothes, had been destroyed since the case

was dismissed in 1992.  (Reporter's Transcript on Appeal (RT) at 1840.)  Later in the trial,

petitioner, in pro per, filed a motion for new trial, in which he informed the court that he was

"deprived of viewing" the following evidence: (1) a bottle containing the victim's fingerprints;

(2) cigarette butts from the victim's cigarettes; (3) bloody sheets; and (4) an enlarged photograph

depicting a spoon with white powder.  (Clerk's Transcript on Appeal (CT) at 598.)  Petitioner

also asserted, without elaboration, that "evidence was destroyed."  (<u>Id</u>.)  At the hearing on the

motion for new trial, petitioner's counsel explained that the 1992 rape charges

> had originally been set for a trial and then were dismissed and the
> Police Department destroyed several items.
>
> We had a Hitch motion about that, possibly in front of Manteca,
> which is why the Court may not be completely familiar with it.
>
> Then I believe it was raised again here.  And it was found to be
> items of less than persuasive evidentiary value.  There was gum,
> gum wrappers, Coke, things like that that the officer testified,
> either here or in Manteca, that they were items that would
> disintegrate anyway.

1   (RT at 2729.) Petitioner also addressed the court on the motion for new trial, explaining as

2   follows:

> There was a Pepto-Bismol bottle.  Items that would prove, along
> with the receipt in a bag in my vehicle, that proved that we made
> this stop at this store and contradict this road, whatever this gal
> said, down Union, down Wawona, and down Manteca Road.
>
> My question is, she was never questioned, how did we get to 251
> Martha Street?
>
> The police report, if you was to read it, says that he were on
> Yosemite, made a left, south on Union, made a left, heading east
> on Wawona, then south on Manteca Road.  How did we ever get to
> 251 Martha Street?
>
> Those items were in my car with the receipt.  The time and date
> and the name of the store, that proves we made a stop.  That proves
> this girl was lying on the stand.  And that evidence was destroyed.
>
> * * *
>
> From the '92 case, there is a listing of several colored [sic] of
> underwear in the police report, of items confiscated or taken in
> possession of the Police Department.  Therefore, the DNA testing
> was never done on her panties.
>
> She stated up on the stand, "yes, those are my panties."
>
> But in the police report, we got pink, we got white, and red panties,
> along with red shorts.
>
> I requested DNA testing be done for body fluids from Mrs.
> whatever she is now, Medeiros, Schultz, whatever she is, and it
> was never done.
>
> * * *
>
> But, yes, again, the prosecution was allowed numerous blow-ups
> for their prosecuting of me.  And I was not allowed one simple
> blow-up for my defense.

23   (Id. at 2731-34.)

> Petitioner's counsel made further comments on the motion, stating as follows:
>
> MR. PIGGOTT:  Judge, I just might for the record indicate Mr.
> Lizarraga is absolutely correct that he did ask for a DNA testing.
> And I made a decision that it certainly was not worth the cost.  Not

18

because we were not being provided the money, the Court
responded to every request I made for funds.

THE COURT: You did indeed.

MR. PIGGOTT: But there was no chemical evidence whatsoever
about the rapist in that case.  It was completely an identification, he
is the one.

So – and there was no indication that there might even be seminal
fluid or that somebody else might have placed seminal fluid.

So it really had no evidentiary value, and I made the decision not to
do that, because it is very costly to do a DNA test.  And if it
doesn't prove anything.

I agree with Mr. Lizarraga he requested that, and I made the
decision not to do it.

And as far as the picture goes, I also, at the time, I decided that it
really didn't show anything, and there wasn't a need to do it.  It
wasn't I was denied the right to have blow-ups.  I certainly was.
Even Mr. Dunlap offered to blow up any pictures I would have
given the request for, and I gave a request for some and I got them.

But I didn't think that established anything, so we had an in-court
motion, there is a record of that, and just decided there was no need
to blow it up if we weren't going to be able to use it.

(Id. at 2734-36.)  The trial court subsequently denied the motion for new trial, stating as follows:

All right.  The Court will deny the motion for a new trial under
1181 of the California Penal Code.  It appears that all T's were
crossed and all I's were dotted.  There does not appear to be any
allegations set forth in 1181 that would support a motion for new
trial.  So the motion is denied then.

(Id. at 2736.)

After a review of the record, this court concludes that petitioner has failed to

establish "actual, non-speculative prejudice" from the two and one-half year delay in refiling the

1992 rape charges.  The record contains no evidence that destruction of evidence after the

original case was dismissed prejudiced petitioner's trial in 1996.  Rather, the expected relevance

of any of the destroyed evidence is generally speculative.  The court also notes that the

19

1  government's case against petitioner for the 1992 rapes was strong.  The victim testified at length

2  about the events and was subject to extensive cross-examination.  (See e.g., RT at 1208-86.)  She

3  unequivocally identified petitioner as the perpetrator.  (Id.)  A significant portion of the victim's

4  testimony was corroborated by her housemate at the time.  (Id. at 1287-1321.)  Further, the length

5  of the delay in refiling the rape charges, when balanced against the reason for the delay – the fact

6  that the victim finally agreed to testify – does not offend "fundamental conceptions of justice."

7  Accordingly, this claim should be denied.[2]

8  _____

9      [2] Even assuming arguendo that petitioner's "speedy trial" claim is concerned with post-indictment delay, it should still be denied.  The Sixth Amendment provides that "[i]n all criminal

10  prosecutions, the accused shall enjoy the right to a speedy and public trial . . ."  U.S. Const., Amend. VI.  This amendment protects only against post-indictment delay.  United States v.

11  Marion, 404 U.S. 307, 313 (1971).  The Sixth Amendment does not proscribe all delay of the trial of a criminal defendant.  Rather, the United States Supreme Court has "qualified the literal

12  sweep of the provision by specifically recognizing the relevance of four separate enquiries: whether delay before trial was uncommonly long, whether the government or the criminal

13  defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result."  Doggett v. United

14  States, 505 U.S. 647, 650-51 (1992) (citing Barker v. Wingo, 407 U.S. 514, 530 (1972));  McNeely v. Blanas, 336 F.3d 822, 826-27 (9th Cir. 2003); United States v. Valentine, 783 F.2d

15  1413, 1417 (9th Cir. 1986).  No one of these four factors is either a necessary or a sufficient condition to support a finding that there has been a deprivation of the constitutional right to a

16  speedy trial.  Rather, these factors are related and must be considered together.  Barker, 407 U.S. at 533.  However, the first factor, length of delay, "is to some extent a triggering mechanism.

17  Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance."  Id. at 530.  Courts have generally found post-

18  accusation delay "presumptively prejudicial" when it begins to approach one year.  Doggett, 505 U.S. at 652, n.1.

19      The two and one-half year delay between the dismissal of the rape charges in 1992 and their refiling in 1996 is more than one year in length and is, therefore, presumptively

20  prejudicial.  Accordingly, the court must inquire into the other factors set forth in Barker.  The reason for the delay in this case was not for an improper purpose.  See Marion, 404 U.S. at 325

21  (it would be improper for the prosecution to intentionally delay in order "to gain some tactical advantage over [defendants] or to harass them").  As noted by the California Court of Appeal,

22  petitioner did not assert his right to a speedy trial in the Superior Court.  See Barker, 407 U.S. at 531-32 ("The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary

23  weight in determining whether the defendant is being deprived of the right.  We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a

24  speedy trial.").  Finally, it is the fourth factor, prejudice to the defendant, that weighs most heavily in the evaluation of this claim.  Valentine, 783 F.2d at 1417.  As explained above, the

25  record does not demonstrate that petitioner was prejudiced by the delay in bringing the 1992 rape charges to trial.  There is no evidence that the delay in bringing the case to trial was for any

26  improper purpose or that the prosecution improperly sought to lengthen these proceedings.

D.  Severance of Charges

Petitioner's next claim is that his rights to due process and a fair trial were violated when the trial court denied his motion to sever trial of the 1992 rape charges from the trial of the other counts against petitioner.  Petitioner's claim in this regard was rejected by the California Court of Appeal in a reasoned decision on direct appeal and was summarily denied by the California Supreme Court on petition for review.  The state appellate court described the claim and the background facts as follows:

> Before trial, the [petitioner] moved to sever the 1992 rape charges from the 1996 attempted rape and murder charges.  He claimed that his intended defenses to the 1992 rape charges and 1996 attempted rape charges were inconsistent because as to the 1992 rape charges his defense was to be consent while the defense to the 1996 attempted rape charges was to be that he was under the influence of drugs or alcohol and the alleged victim tried to rob him.  He also claimed the rape charges were likely to inflame the jury and influence the jurors with respect to the murder case, which was based on circumstantial evidence.  The [petitioner] also speculated that Evidence Code section 1108 might be found unconstitutional and, in that instance, the evidence would not be cross-admissible.  The trial court denied the motion to sever.  It determined that there was no substantial inconsistency in the defenses the [petitioner] intended to proffer.  Although the court denied the motion, it did so without prejudice so that the [petitioner] could renew the motion if some further development in the law or if the evidence associated with this case resulted in a lack of cross-admissibility.  The [petitioner] did not renew the motion during trial.
>
> The [petitioner] asserts the trial court abused its discretion in denying the motion to sever because the joinder or three weak cases prejudiced him.  Specifically, he claims the trial court should have severed the 1992 rape charges from the 1996 attempted rape and murder charges.  He does not contend the 1996 attempted rape charges should have been severed from the 1996 murder charge.

(Opinion at 21-22.)[3]

Accordingly, to the extent petitioner is raising a Sixth Amendment claim, it should be  denied.

[3]  At the time petitioner filed his motion to sever, the California Supreme Court had not decided whether Evidence Code section 1108 violated a defendant's due process rights.  The California Supreme Court now has held that California Evidence Code section 1108 does not

After an analysis of state law, the state appellate court concluded that the trial court did not abuse its discretion when it denied petitioner's motion to sever.  The court explained its reasoning as follows:

> First, much of the evidence supporting the 1992 rape charges is cross-admissible with the evidence supporting the 1996 attempted rape charge, which was joined without objection or motion to sever to the murder charge.  The evidence concerning the rape and attempted rape charges was cross-admissible under Penal Code section 1108, which allows the prosecution to present evidence of the defendant's commission of other sexual offenses to prove the commission of the sexual offense charged.  The [petitioner], in his opening brief, mentions that "*certain evidence . . . was not cross-admissible.*"  (Italics added.)  Nonetheless, he makes no effort to specify what was that "certain evidence."  Nor does he attempt to establish why such unspecified evidence was prejudicial.  Accordingly, he has not carried his burden of showing that the cross-admissibility factor weighed in favor of severance.

> Second, this case does not present a situation in which any of the charges was likely to inflame the jury against the [petitioner].  All of the charges were very serious and involved assaultive behavior.

> And third, this case does not involve charges carrying the death penalty.

> Before we consider the [petitioner's] argument concerning the joinder of three allegedly weak cases, we note that we could end our analysis here because the [petitioner] has not shown prejudice through lack of cross-admissibility.  (See People v. Bradford (1997) 15 Cal.4th 1229, 1315, 1316.)  "Cross-admissibility suffices to negate prejudice. . . ."  (Ibid.)

> It is highly unlikely the outcome on any of the charges was altered by a "spillover" effect.  As the [petitioner] points out, the 1992 rape charges were based on direct evidence and the 1996 murder charge was based on circumstantial evidence.  The evidence concerning each charge, though, strongly established the [petitioner's] guilt.  Furthermore, since the evidence was cross-admissible, severance of the 1992 rape charges from the 1996 attempted rape and murder charges would not have resulted in

---

violate due process because "the policy considerations favoring the exclusion of evidence of uncharged sexual offenses are outweighed in criminal sexual offense cases by the policy considerations favoring the admission of such evidence."  People v. Falsetta, 21 Cal. 4th 903, 911 (1999) (quoting People v. Fitch, 55 Cal. App. 4th 172, 181-82 (1997)).

different evidence being presented to the jury, for the most part. The "spillover" effect was not a legitimate concern.

Accordingly, the trial court did not abuse its discretion by denying the [petitioner's] motion to sever the 1992 rape charges from the 1996 attempted rape and murder charges.

(Id. at 24-25.)[4]

The question presented in this federal habeas corpus petition is whether the state appellate court's adjudication of this issue resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law.  Habeas relief is appropriate only where the "simultaneous trial of more than one offense . . . actually render[ed] petitioner's state trial fundamentally unfair and hence, violative of due process." Sandoval v. Calderon, 241 F.3d 765, 772 (9th Cir. 2000) (quoting Featherstone v. Estelle, 948 F.2d 1497, 1503 (9th Cir. 1991)). See also Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).  As the Supreme Court has explained, "[i]mproper joinder does not, in itself, violate the Constitution."  United States v. Lane, 474 U.S. 438, 446 n.8 (1986).  "Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." Id.  "The requisite level of prejudice is reached only if the impermissible joinder had a "substantial and injurious effect or influence in determining the jury's verdict." Davis, 384 F.3d at 638 (quoting Sandoval , 241 F.3d at 772).  A reviewing court "must consider on a count by count basis whether the trial on a particular count was fundamentally unfair in light of that count's joinder with one or more other charges." Featherstone, 948 F.2d at 1503.

---

[4]  In California, "[r]efusal to sever may be an abuse of discretion where:  (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a 'weak' case has been joined with a 'strong' case, or with another 'weak' case, so that the 'spillover' effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a 'capital case.'" People v. Sapp, 31 Cal. 4th 240, 258 (2003) (quoting People v. Bradford, 15 Cal. 4th 1229, 1315 (1997)).

1    A trial court has broad discretion in ruling on severance motions.  Herd v.

2  Kincheloe, 800 F.2d 1526, 1529 (9th Cir. 1986).  The relevant factors are judicial economy and

3  prejudice.  United States v. Lewis, 787 F.2d 1318, 1320 n.3 (9th Cir.), amended 798 F.2d 1250

4  (9th Cir. 1986).  A reviewing court must consider:  (1) whether strong evidence of one count is

5  presented with relatively weak evidence on another count; (2) whether the evidence of the other

6  count is cross-admissible; and (3) whether the state trial court admonished the jury as to the

7  limited use of the other crimes evidence.  See Bean v. Calderon, 163 F.3d 1073, 1084-86 (9th

8  Cir. 1998).  Even if the evidence is not cross-admissible, joinder generally does not result in

9  prejudice if the evidence of each crime is simple and distinct and the jury is properly instructed

10  so that it may compartmentalize the evidence.  Id. at 1085-86; see also United States v. Johnson,

11  820 F.2d 1065, 1071 (9th Cir. 1987).

12    As found by the state appellate court, the evidence on all counts against petitioner

13  was relatively strong, notwithstanding the fact that the 1992 rape case was based on direct

14  evidence whereas the 1996 murder charge was based on circumstantial evidence.  Also, evidence

15  on the rape and attempted rape charges was cross-admissible.  Further, petitioner's jury was

16  instructed to consider each count separately and was admonished on the limited use of other

17  crimes evidence.  (CT at 425, 479.)  Under these circumstances, the trial court did not abuse its

18  discretion in denying petitioner's severance motion.

19    Even assuming arguendo that the state trial court erred in denying petitioner's

20  motion for severance, petitioner has failed to show that he was prejudiced by joinder of the

21  charges against him.  The crimes charged against petitioner were clearly distinct and the jury

22  should have been easily able to distinguish the evidence introduced with respect to one charge

23  from that introduced in the others.  There is no evidence that the jury was confused or was unable

24  to consider separately the evidence which pertained to each charged crime.  The evidence

25  supporting petitioner's convictions was not unequal, none of the offenses was significantly more

26  inflammatory than the other and there was sufficient evidence to support a conviction of each

24

offense without use of evidence introduced with respect to the other.  Under these circumstances,

consolidation of the 1992 rape charges with the other charges against petitioner did not have a

substantial and injurious effect or influence in determining the jury's verdict.  Accordingly,

petitioner is not entitled to relief on this claim.

E. <u>Marsden Motion</u>

In his fifth claim, petitioner contends that the trial court violated his rights to

effective assistance of counsel and due process when it denied his motion for substitution of

counsel.  The California Court of Appeal rejected this claim in a reasoned decision on direct

appeal and the California Supreme Court summarily denied the claim on petition for review.  The

state appellate court summarized the background surrounding this claim as follows:

> Before trial, the [petitioner] moved to replace his appointed
> counsel, Patrick Piggott.  (<u>People v. Marsden</u>, (1970) 2 Cal.3d
> 118).  He asserted Piggott lied to him, did not visit him enough,
> and was not adequately investigating the case.  He also claimed
> Piggott was not communicating well with him and, as a result, the
> [petitioner] could not trust him, although he conceded that Piggott
> is "very highly qualified."  When the trial court asked Piggott to
> respond, he agreed that the communication between the [petitioner]
> and him was "fairly nonproductive for whatever reasons."  Piggott
> continued:
>
> "Shortly after I began representing [petitioner] we had some
> misunderstandings.  I filed a [Penal Code section] 1368 [motion to
> determine the (petitioner's) competence to stand trial].  Part of that
> was based on [petitioner] telling me about visits from angels.  My
> concern was this information he's giving me coming from visions
> or from his memory.  The 1368 doctors, I forget who they were at
> this point, one of them recommended perhaps he should have an
> attorney that believed in paranormal.  Paranormal experiences are
> not necessarily unusual."
>
> Piggott explained that he and the [petitioner] had a conflict
> concerning whether certain evidence relating to prior sexual
> offenses would be admissible under Evidence Code section 1108.
> The [petitioner] believed a San Francisco Superior Court case that
> limited admissibility was controlling.  Piggott disagreed.  Piggott
> described his investigation of the case, including the activities of
> the appointed investigator, and his efforts to communicate with the
> [petitioner].  He informed the court that he felt the [petitioner] was
> irrational about some of the issues they discussed.

1         The trial court then explained to the [petitioner], at length, the
      process of investigating the case and preparing for trial.  The court
2     informed the [petitioner] that the concerns the [petitioner] had
      raised about inadequate investigation and failure of Piggott to visit
3     the [petitioner] were unfounded because the case was being
      investigated by both the appointed investigator and Piggott and that
4     the visits to the [petitioner] by the investigator and Piggott were
      furthering his defense.  The [petitioner] and Piggott both agreed to
5     work harder.

6     (Opinion at 26-27.)

7         The state appellate court denied petitioner's claim on the grounds that: (1) the

8     conflict between petitioner and his counsel could not have been "irreconcilable" because both

9     parties agreed to work harder to make the relationship work; (2) counsel's concern about

10    petitioner's mental health did not constitute an irreconcilable conflict because "courts are never

11    required to condition appointments of attorneys on whether they believe in the paranormal;" (3)

12    petitioner's disagreement over counsel's trial tactics was insufficient to warrant appointment of

13    new counsel; (4) petitioner's complaints about events that took place after the hearing on the

14    <u>Marsden</u> motion were irrelevant to the court's consideration of the motion; and (5) by

15    petitioner's acquiescence to the continued representation of Piggott during trial, petitioner

16    signaled that he was satisfied with Piggott.  The court stated, "we cannot reverse based on the

17    failure to grant a <u>Marsden</u> motion the defendant did not make."  (<u>Id.</u> at 29.)

18        The Sixth Amendment to the Constitution guarantees the right to the assistance of

19    counsel in a criminal prosecution.  Such assistance must be effective and competent.  <u>Strickland</u>

20    <u>v. Washington</u>, 466 U.S. 668 (1984).  Where a defendant is proceeding with the assistance of

21    counsel, he may move to dismiss or substitute counsel, whether appointed or retained.   The grant

22    or denial of such a motion may depend on its timeliness and the nature of the conflict between

23    the defendant and current counsel.  <u>United States v. McClendon</u>, 782 F.2d 785, 789 (9th Cir.

24    1986).  In assessing a federal trial court's decision to deny a motion to substitute counsel on

25    direct appeal, the court looks at three factors:  "'(1) timeliness of the motion to dismiss counsel;

26    (2) the adequacy of the court's inquiry into the defendant's complaint; and (3) whether the

1  conflict between the defendant and his attorney was so great that it resulted in a total lack of

2  communication preventing an adequate defense.'" Id. (quoting United States v. Mills, 597 F.2d

3  693, 700 (9th Cir. 1979)).  See also, United States v. Musa, 220 F.3d 1096, 1102 (9th Cir. 2000);

4  United States v. Walker, 915 F.2d 480, 482 (9th Cir. 1990), overruled on other grounds by

5  United States v. Norby, 225 F.3d 1053 (9th Cir. 2000).

6          The Ninth Circuit Court Appeals has ruled that in assessing such a claim

7  in the context of a § 2254 proceeding such as this, the focus is different than that on direct

8  review.  In Schell v. Witek, 218 F.3d 1017 (9th Cir. 2000) (en banc) the court stated:

9           Our primary reason for accepting this case for en banc review was
             to correct the standard of review we have been using to examine
10          the constitutionality of a state court's handling of a motion to
             substitute appointed counsel based on allegations of an
11          irreconcilable conflict.  In Bland, we said that the test is whether a
             state court's denial of such a motion was for an "abuse of
12          discretion."  Bland, 20 F.3d at 1475.

13                                    * * *

14          [O]ur only concern when reviewing the constitutionality of a state-
             court conviction is whether the petitioner is "in custody in
15          violation of the Constitution or laws or treaties of the United
             States."  28 U.S.C. § 2254(a).  See also Coleman v. Thompson,
16          501 U.S. 722, 730, 111 S.Ct. 2546. 115 L.Ed. 640 (1991) ("The
             [habeas] court does not review a judgment but the lawfulness of
17          the petitioner's custody simpliciter.") (emphasis in original).  A
             particular abuse of discretion by a state court may amount also to a
18          violation of the Constitution, but not every state court abuse of
             discretion has the same effect.  Accordingly, to the extent that they
19          conflict with this opinion, we overrule Bland and Crandell v.
             Bunnell, 144 F.3d 1213 (9th Cir. 1998).

20

21  Id. at 1024-25 (footnotes omitted).

22          In Schell the court determined that it was "well established and clear that the Sixth

23  Amendment requires on the record an appropriate inquiry into the grounds of such a motion, and

24  that the matter be resolved on the merits before the case goes forward."  218 F.3d at 1025.  See

25  also  Hudson v. Rushen, 686 F.2d 826, 829 (9th Cir. 1982) ("Thus, the state trial court's

26  /////

                                          27

1  summary denial of a defendant's motion for new counsel without further inquiry violated the

2  Sixth Amendment.")

3            Under such an inquiry the state trial court's handling of the motion to substitute

4  appointed counsel in this case certainly passes constitutional muster.  Petitioner was given a full

5  opportunity to air his complaints about counsel's performance.  The trial court allowed petitioner

6  the opportunity to fully explain his position regarding his counsel on the record.  The court

7  focused on and fully explored the nature of the conflicts, as expressed by petitioner.  This court

8  finds that the trial court made an adequate inquiry into petitioner's complaints and resolved the

9  matter on the merits before proceeding with the case.

10            Moreover, even under the prior "abuse of discretion" standard of review, it

11  appears that the state trial court's resolution of the motions was appropriate.  After inquiry, it

12  appeared that the conflict between the defendant and his attorney was not so great that it resulted

13  in a total lack of communication preventing an adequate defense.  As noted by the state appellate

14  court, petitioner agreed to continue with current counsel and the entire trial was prosecuted

15  without further complaint by petitioner.  Even though petitioner and counsel may have disagreed

16  about whether petitioner should have pursued an insanity defense and/or various other matters,

17  the disagreements did not prove so substantial that counsel was unable to present an adequate

18  defense.  Under these circumstances, the trial court did not err in denying petitioner's request for

19  new counsel.  See United States v. Robinson, 913 F.2d 712, 716 (9th Cir. 1990) (no error in

20  failing to offer defendant substitute counsel where the crux of the problem was defendant's anger

21  at his attorney's refusal to raise defenses to the charges which the attorney considered frivolous).

22            Because the denial of petitioner's motions for appointment of substitute counsel

23  were not an abuse of the state court's discretion, no Constitutional violation is presented.  Schell

24  v. Witek, 218 F.3d at 1025.  Accordingly, petitioner is not entitled to relief as to this claim.

25  /////

26  /////

28

F. <u>Admission into Evidence of Petitioner's Statements to Michelle</u>

Petitioner's next claim is that the trial court abused its discretion when it denied petitioner's motions for a mistrial and a new trial on the grounds of prosecutorial misconduct. The California Court of Appeal rejected this claim in a reasoned decision on direct appeal and the California Supreme Court summarily denied it on petition for review.  The state appellate court explained the facts surrounding this claim as follows:

Soon after the 1996 crimes against Michelle, she gave a statement to a detective.  The last part of the interview occurred as follows:

"[Detective:] 'So [are] there any details you can remember at all right now that – '

"[Michelle:] 'Yeah.  I remember him telling me that he was a killer in the truck.'

"[Detective:] 'He told you that?'

"[Michelle:] 'He kills people for money or something like that.'

"[Detective:] 'And did he elaborate on that?'

"[Michelle:] 'Uh, well, vaguely.  We were going towards Stockton. I can't even believe I was in this man's truck.  I'm in shock.  He said something like, "Yeah, I kill people for money."'

"[Detective:] 'Okay.'

"[Michelle:] 'He did say that.  I – I go, "Really?  Are you going to kill me?"  He said, "No."'

"[Detective:] 'Okay.  Well, at this point, the interview – supplemental interview with Michelle [ ] is terminated.'"

The [petitioner] made a motion in limine to exclude the [petitioner's] statements to Michelle concerning his killing for money.  Prosecutor Dunlap opposed the motion, stating that it should be admitted to show the [petitioner] was bragging about being a killer.  The court noted that the statement might be relevant if it inspired fear in Michelle, to get her to cooperate.  The trial court granted the motion in limine to exclude the statement. However, the court told the prosecution it could "renew the motion," outside the presence of the jury, if it felt it could show admissibility.

/////

1     Again before trial, the prosecution raised the issue.  Dunlap stated:
"I think the statement that 'I'm a killer' shows a complete lack of
2     remorse for dead individuals, and shows his actions as bravado in
going back to the very house where he killed. [¶] I don't
3     understand why we are not allowed to bring in statements of the
[petitioner] that reflect his willingness to talk about killing people,
4     when that's exactly what he's charged with."  The court reiterated
its position that the prosecution would need to show admissibility
5     before the statement could be admitted.

6     Later, Michelle testified at trial.  After her testimony, the tape of
her interview with the detective was played for the jury by the
7     prosecution.  In violation of the court's order excluding the
statement about killing for money, the tape had not been edited to
8     remove the statement.

9     Responding to a defense objection and despite the court's earlier
ruling that the statement was not admissible, Dunlap incorrectly
10     argued that the court had not made a ruling on the motion in limine
but had reserved the issue to determine whether the statement
11     caused Michelle to fear the [petitioner] and cooperate by taking off
her clothes.  He also stated that defense counsel had indicated a
12     desire to use the taped statement in the defense case, so he went
ahead and presented it in the prosecution's case.  He asserted the
13     statement was admissible because Michelle had testified she took
her clothes off because of her fear the [petitioner] would kill her.
14     Based on this argument, the trial court then concluded the
statement was admissible.  It determined that the probative value
15     on the limited issue of the state of mind of Michelle outweighed
the prejudicial effect.

16

17     Defense counsel immediately moved orally for mistrial.  He did not
state a ground for the mistrial.  The court did not reference or rule
18     on the motion for mistrial.  As noted, it instead held the statement
was admissible.

19     After trial, the [petitioner], himself, filed a motion for new trial.
As one of the grounds, he asserted: "Judge Frank Grande violated
20     his own order at the In Limine Motion.  The judge ordered the jury
not to hear certain things.  The jury would not be allowed to hear
21     part of the tape where Michelle B[.] stated, 'I was a professional
killer.'  The jury heard that part and again the jury was
22     contaminated and reached an opinion of [petitioner] before the trail
[sic] was over."  The trial court denied the motion for new trial.

23

24    (Opinion at 32-35.)

25         On direct appeal, as in this court, petitioner argued that the motions for mistrial

26   and new trial should have been granted based on the misconduct of the prosecutor in playing the

offending portion of the tape for the jury in violation of the trial judge's rulings.  The Court of

Appeal agreed that the prosecutor committed gross misconduct in ignoring the trial judge's

previous rulings and intentionally eliciting inadmissible testimony.  (Id. at 35-37.)  However, the

court concluded that the misconduct was harmless and, therefore, did not justify reversal.  (Id.)

The court explained its reasoning as follows:

> The [petitioner] did not object specifically to the prosecution's
> presentation of the statement attributed to the [petitioner] by
> Michelle on the ground it constituted prosecutorial misconduct.
> Accordingly, the trial court never had the opportunity to rule on the
> motion for mistrial or motion for new trial on that basis.  Instead,
> the court found the evidence was admissible on the issue of
> Michelle's state of mind.
>
> As to the murder of Minier, there was no evidence he killed Minier
> for money; therefore, the statement appears to have had no
> relevance to that charge.  As to the attempted rape of Michelle,
> however, the trial court pointed out that the statement could be
> relevant if it were shown the statement affected her state of mind
> and influenced her to cooperate with the [petitioner] for fear he
> would kill or hurt her.  At the time the court held the statement
> admissible, Michelle's state of mind was in issue.  Defense counsel
> implied through a number of questions on cross-examination that
> the encounter was not coercive.  The court's conclusion that the
> evidence was not unduly prejudicial was appropriate in light of the
> probative value of the evidence.
>
> Accordingly, the trial court acted properly in determining the
> evidence was admissible and was not asked to find prosecutorial
> misconduct.  Although the prosecutor's tactics were unacceptable,
> there was no error and the [petitioner] was not prejudiced.

(Id. at 37-38.)

"To succeed on a motion for a new trial based on prosecutorial misconduct, a

defendant must show first that the prosecution engaged in improper conduct and second that it

was more probable than not that the prosecutor's conduct 'materially affected the fairness of the

trial.'"  United States v. Aichele, 941 F.2d 761, 765 (9th Cir. 1991) (quoting United States v.

Smith, 893 F.2d 1573, 1583 (9th Cir.1990).  Assuming arguendo that the prosecutor committed

misconduct when he improperly introduced evidence of Michelle's inflammatory statements,

petitioner has failed to show that the misconduct "materially" affected the fairness of his trial.

1   As explained by the state appellate court, evidence that petitioner told Michelle he was a paid

2   killer was relevant to rebut any defense suggestion that Michelle's actions in complying with

3   petitioner's requests were voluntary or consensual.  Further, the statement had little relevance to

4   the charge of murder, since the prosecution was not operating under a theory that the murder was

5   for hire.  Under these circumstances, the relevance of petitioner's statement outweighed any

6   possible prejudice.  This court also notes the state court's observation that the trial court was not

7   called upon to rule on a motion for new trial on the grounds of prosecutorial misconduct.  The

8   trial court did not err in failing to grant a motion that was not presented to it.

9           The decision of the California Court of Appeal that petitioner failed to show

10  prejudice from the prosecutor's misconduct is not contrary to or an unreasonable application of

11  United States Supreme Court authority.  Accordingly, petitioner is not entitled to relief on this

12  claim.

13          G.  Sufficiency of the Evidence

14          Petitioner claims that the evidence was insufficient to support his conviction of

15  the murder of Minier.

16          There is sufficient evidence to support a conviction if, "after viewing the evidence

17  in the light most favorable to the prosecution, any rational trier of fact could have found the

18  essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307,

19  319 (1979).  See also Prantil v. California, 843 F.2d 314, 316 (9th Cir. 1988) (per curiam).  "Put

20  another way, the dispositive question under Jackson is 'whether the record evidence could

21  reasonably support a finding of guilt beyond a reasonable doubt.'"  Chein v. Shumsky, 373 F.3d

22  978, 982 (9th Cir. 2004) (quoting Jackson, 443 U.S. at 318).[5]  The federal habeas court

23

24          [5] The Ninth Circuit Court of Appeals has declined to consider the question of whether
    the AEDPA requires an additional degree of deference to state courts' resolution of sufficiency of

25  the evidence claims.  See Bruce v. Terhune, 376 F.3d 950, 957 (2004); Chein v. Shumsky, 373
    F.3d 978, 983 (9th Cir. 2004).  Because petitioner's claim fails under the Jackson standard this

26  court also need not decide whether the enactment of the AEDPA altered that test for purposes of
    federal habeas proceedings.

1  determines sufficiency of the evidence in reference to the substantive elements of the criminal

2  offense as defined by state law.  Jackson, 443 U.S. 307, 324 n.16; Chein, 373 F.3d at 983.  It is

3  the province of the jury to 'resolve conflicts in the testimony, to weigh the evidence, and to draw

4  reasonable inferences from basic facts to ultimate facts."  Jackson, 443 U.S. at 319.  "The

5  question is not whether we are personally convinced beyond a reasonable doubt.  It is whether

6  rational jurors could reach the conclusion that these jurors reached."  Roehler v. Borg, 945 F.2d

7  303, 306 (9th Cir. 1991).

8          The decision of the state court of appeal is the last reasoned state court rejection

9  of petitioner's insufficient evidence claim.  The state court rejected the claim as follows:

> The [petitioner] attacks several specific aspects of the evidence
> against him.  We consider each specific attack and then explain
> why the evidence sufficiently established he was the one who
> killed Minier.  Since the [petitioner] does not challenge any
> element of the murder conviction except his identity as the killer,
> we do not discuss any other element.
>
> The [petitioner] finds the evidence of his own threats against
> Minier "unpersuasive."  He states: "[A]lthough Minier obtained a
> 'stay-away' order in 1995, Minier himself essentially revoked that
> order by permitting appellant to move back into his house on
> occasion.  Viewed in the very best light, Minier invoked the
> protection of the restraining order haphazardly, when he felt like it.
> That was not the action of a man in fear for his life."  The
> [petitioner] goes on to argue Minier was calm when officers
> responded to his 911 call on December 31, 1995, and did not
> indicate the [petitioner] had threatened him.
>
> Contrary to the [petitioner's] assessment, the evidence concerning
> the restraining orders against the [petitioner] and Minier's 911 call
> just a day or two before he was murdered is highly incriminating to
> the [petitioner].  In September 1995, less than four months before
> his death, Minier filed an application for a restraining order against
> the [petitioner].  In support of the application, Minier stated, in
> part: "All I want for him is to just leave the house, but he won't –
> but he won't do that and I'm not capable of literally throwing him
> out.  And when I do not – when I lock him out, then he has made
> various threats like, 'I'll burn the house down.'"
>
> Although Minier let the [petitioner] return to the house after he
> obtained the restraining order, Minier called 911 on the morning of
> December 31, 1995.  Also, Minier told his neighbor he was afraid
> of the [petitioner] in 1995.  That fear grew as the year progressed.

The [petitioner] threatened to burn down Minier's house and personally threatened Minier.  The last few times the neighbor spoke to Minier, in the latter part of 1995, Minier was very upset.  Thus, there was evidence of escalating threats by the [petitioner] against Minier in 1995.

The [petitioner] asserts the typewritten note about Minier being the recipient of some of the [petitioner's] evil actions had "no evidentiary value whatsoever as it cannot be determined when it was written."  The [petitioner] overstates the significance of the absence of a date on the note.  Because the note was in a place of ready access in the house, it could be inferred the note was of recent vintage.  Furthermore, the evidence that the [petitioner's] threats and actions toward Minier during the latter part of 1995 would also point to an authorship date around that period of time.  The note was not so devoid of evidentiary value as the [petitioner] would have us think.

Mostly because of the fact Minier's dead body was under a warm electric blanket, it was difficult for the experts to specify a time of death.  For various reasons, they concluded the time of death was anywhere from the evening of January 1, 1996, to the morning of the next day.  The [petitioner] contends he had alibis for "two-thirds of the time-span within which Minier could have been murdered."  There is no support for his contention of insufficient evidence in the fact that he was not available to commit the crime during two-thirds of the period of time in which it may have been committed.  Construing the evidence in favor of the judgment, it shows he had plenty of time to commit the crime.

The [petitioner] attempts to minimize the evidence of incriminating rope fibers found in his room by suggesting that the officers may have tracked the fibers between the rooms.  This is nothing more than a jury argument.  The jury is authorized to weigh the evidence.  We are not so authorized.  Instead, the presence in the [petitioner's] room of fibers from the rope that was used to kill Minier can be used to infer the [petitioner] killed Minier than tracked the fibers himself into his room or that the [petitioner] possessed the rope in his room and took it to Minier's room to murder him, leaving fibers behind.

The prosecution introduced evidence that the house was tidy and locked and Minier was not robbed to prove he was not killed by an intruder.  The [petitioner] seeks to discredit this evidence by showing the [petitioner] was not a tidy person and, indeed, had a messy room.  Therefore, if he had killed Minier he would have left a mess.  Again, this was argument for the jury, not for a reviewing court.  There was a reasonable inference of the [petitioner's] guilt to be drawn from the condition of the house because an occupant of the house would not have to break in and would be less likely to ransack it.

34

1

2

3

4

5

6

7

8

9

> Taken as a whole, the circumstantial evidence of the [petitioner's] guilt with regard to the murder of Minier is strong. The [petitioner] misused and threatened Minier and abused his trust. In 1995, Minier's fear of the [petitioner] grew, as evidenced by the restraining order, Minier's complaints to his neighbor, and his 911 call. The [petitioner] had access to the home during the time period in which Minier was murdered. Fibers from the rope that was used to kill Minier were found in the [petitioner's] bedroom. And the [petitioner] used the same method, choking the victim, he had used on previous victims of his crimes of violence. The manner in which Minier was killed and the condition of the house indicated Minier was killed by someone with ready access to the house. In fact, the [petitioner] was in the house assaulting a woman at a time either just before or just after he murdered Minier. The logical and reasonable inference is that the [petitioner] killed Minier. Accordingly, the [petitioner's] sufficiency of evidence argument is without merit.

10  (Opinion at 39-42.)

11      After reviewing the entire record, this court finds that the state court's conclusion

12  that there was sufficient evidence to establish petitioner's guilt beyond a reasonable doubt is not

13  an unreasonable application of the federal due process standards set forth above. The state

14  court's decision was not contrary to or an unreasonable application of federal law, nor was it

15  based on an unreasonable determination of the facts. Accordingly, this claim should be denied.

16      H. Exclusion of Evidence

17      Petitioner's final claim is that the trial court violated his rights pursuant to the

18  Sixth Amendment when it excluded evidence regarding his defense of "third party culpability."

19  (Attach. to Am. Pet. at 5.) The claim is stated, in full, as follows:

20

21

22

> Trial court violated petitioner's constitutional rights under the sixth amendment. Trial court excluded certain evidence regarding petitioner's defense of "third party culpability" to count 1, the murder of Ken Minier, which prevented petitioner from fully presenting that defense.

23  (Id.) Petitioner's claim in this regard was rejected by the California Court of Appeal in a

24  reasoned decision on direct appeal and was summarily denied by the California Supreme Court

25  on petition for review. The state appellate court described the claim and its resolution as follows:

26  /////

Before trial, the defense notified the trial court it had three different theories of third party culpability. First, someone associated with Menchaca, the killer of the [petitioner's] father, killed Minier in order to pin the crime on the [petitioner] and defeat his credibility as a witness against Menchaca. Second, Minier was a child molester as evidenced by photographs found in the house of him and teenaged boys. One of those boys or a friend or family member killed Minier in revenge. (The parties agreed Minier was a child molester.) And third, the killer was Timothy Pruden, the boyfriend of the [petitioner's] victim, Michelle. The court excluded the photographs referenced in the second theory, above, after the defense and prosecution agreed that evidence should be presented to the jury some other way, for example, by stipulation. Although no evidence of either the first or third theory was, by then, offered, the trial court did not preclude the defense from thereafter raising its theories of third party culpability at trial.

Later, defense counsel reported to the court and the prosecution that it had located one of the victims depicted in the photographs found in Minier's home. That victim told a defense investigator "that Mr. Minier had been threatened by a family in San Jose concerning activities with a juvenile boy . . . ." Court and counsel agreed more investigation was necessary before relevance and admissibility could be determined. Apparently, at some point during the proceedings, the trial court may have ruled that evidence of a threat from the San Jose family was inadmissible. The [petitioner] does not give a record citation for this ruling; however, the prosecution, outside the presence of the jury during the defense case just before the molestation victim was to testify, mentioned that the court had "already ruled on the threats." Later the same day as the comment by the prosecution, defense counsel stated: "I just want to say one more time for the record that I'm really concerned that other threats to Mr. Minier are not admissible." The trial court responded that the defense could "raise a reasonable doubt that somebody else killed [Minier], but you can't do it by rank hearsay."

Obviously, there are some holes in the record as it is referred to in the [petitioner's] brief. There is no citation to the rather lengthy record where the trial court purportedly ruled on the admissibility of the alleged threat against Minier by a family in San Jose. While there is a later reference to "threats" that had been excluded, there is no clear indication it referred to the San Jose family. Since the record presented by the [petitioner] is inadequately presented for our consideration, the contention that the trial court improperly excluded evidence of third party culpability is waived. (See Cal. Rules of Court, rule 15(a) ["The statement of any matter in the record shall be supported by appropriate reference to the record."].)

Nonetheless, the [petitioner] appears to assert the exclusion of the San Jose threat was error because it was admissible hearsay

36

relevant to third party culpability evidence.  We reject this
assertion both because the record, such as it is, reflects it is
inadmissible hearsay and because it was too attenuated to support a
finding of third party culpability.

The [petitioner] contends Minier admitted to the witness that a San
Jose family had threatened him.  He asserts this statement is
admissible because it is a statement against Minier's penal interest.
He is mistaken.  Only a statement that Minier had committed
molestations would be against his penal interest, not a statement
that someone had threatened him, which is not inculpatory.
(citations omitted.)

Furthermore, the bare fact someone in San Jose threatened Minier
in some unspecified way for having molested a family member is
insufficient to warrant admissibility as evidence of third party
culpability.  (See People v. Kaurish (1990) 52 Cal.3d 648, 684-686
[third party's anger toward victim insufficient to require trial court
to admit evidence linking him to perpetration of crime].)  This
vague statement is not direct or circumstantial evidence linking a
third person to the actual perpetration of the crime.  (People v.
Edelbacher, supra, 47 Cal.3d at p. 1017.)  Accordingly, the trial
court did not err in excluding it.

(Opinion at 43-46.)

Petitioner's claim in this court is also vague and conclusory and should be rejected

on that basis.  See Jones v. Gomez, 66 F.3d 199, 204 (9th Cir. 1995) (quoting James v. Borg, 24

F.3d 20, 26 (9th Cir. 1994)) ("'[c]onclusory allegations which are not supported by a statement of

specific facts do not warrant habeas relief'").  It should also be denied on the merits.

An evidentiary ruling, based on state law, may not be set aside in a federal habeas

corpus proceeding unless it "render[ed] the state proceedings so fundamentally unfair as to

violate due process."  Spivey v. Rocha, 194 F.3d 971, 977-78 (9th Cir. 1999).  See also Whelchel

v. Washington, 232 F.3d 1197, 1211 (9th Cir. 2000); Jeffries v. Blodgett, 5 F.3d 1180, 1192 (9th

Cir. 1993).  Criminal defendants have a constitutional right, implicit in the Sixth Amendment,  to

present a defense; this right is "a fundamental element of due process of law."  Washington v.

Texas, 388 U.S. 14, 19 (1967).  See also Crane v. Kentucky, 476 U.S. 683, 690 (1986) ("[T]he

Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete

defense.'")  However, "that right is not unlimited."  Greene v. Lambert, 288 F.3d 1081, 1090 (9th

1   Cir. 2002).  The right to present a defense is restricted "to assure both fairness and reliability in

2   the ascertainment of guilt and innocence."  Chambers v. Mississippi, 410 U.S. 284, 298 (1973).

3   Thus, a state law justification for exclusion of evidence does not abridge a criminal defendant's

4   right to present a defense unless it is "arbitrary or disproportionate" and "infringe[s] upon a

5   weighty interest of the accused."  United States v. Scheffer, 523 U.S. 303, 308 (1998).  See also

6   Crane, 476 U.S. at 689-91 (discussion of the tension between the discretion of state courts to

7   exclude evidence at trial and the federal constitutional right to "present a complete defense");

8   Greene, 288 F.3d at 1090.

9        The United States Supreme Court has not articulated the specific set of

10  circumstances under which a criminal defendant must be permitted to introduce evidence of

11  third-party culpability.  The Court of Appeals for the Ninth Circuit has determined that where the

12  proferred evidence simply affords a possible ground of suspicion against a third party and does

13  not directly connect that person with the actual commission of the offense, the evidence may be

14  excluded.  See People of Territory of Guam v. Ignacio, 10 F.3d 608, 615 (9th Cir.1993) (citing

15  Perry v. Rushen, 713 F.2d 1447, 1449 (9th Cir.1983)).  A defendant's "undeniably strong"

16  interest in introducing evidence of third-party culpability must be balanced against the state's

17  "compelling" interest in reliable and efficient trials.  Rushen, 713 F.2d at 1451-1452.  Under

18  California law, a criminal defendant has a right to present evidence of third party culpability if it

19  is capable of raising a reasonable doubt about his own guilt.  See Spivey, 194 F.3d at 978 (citing

20  People v. Hall, 41 Cal.3d 826, 833 (1986)).  In order for evidence of another suspect to be

21  admissible, however, "there must be direct or circumstantial evidence linking the third person to

22  the actual perpetration of the crime."  Hall, 41 Cal.3d at 833.  Motive or opportunity is not

23  enough.  Id.

24       Petitioner has failed to present "substantial evidence" linking any other person to

25  the murder of Minier.  Indeed, the evidence described by the California Court of Appeal does not

26  even raise a possible ground of suspicion against any particular person or group of persons.  At

1  most, petitioner's "evidence" is speculative and impermissibly vague.  Further, evidence that

2  some family members of a juvenile allegedly molested by Minier issued unspecific threats

3  against Minier would not necessarily establish petitioner's innocence and is extremely weak

4  compared with the evidence that the petitioner committed the crime.  On balance, the state's right

5  to reliable and efficient trials outweighs petitioner's right to present unsupported allegations

6  against unidentified persons.  The decision of the state appellate court that petitioner's

7  constitutional rights were not violated by the trial court's exclusion of evidence of third-party

8  culpability is not contrary to or an unreasonable application of federal authority and should not be

9  set aside.

10          For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that

11  petitioner's application for a writ of habeas corpus be denied.

12          These findings and recommendations are submitted to the United States District

13  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

14  days after being served with these findings and recommendations, any party may file written

15  objections with the court and serve a copy on all parties.  Such a document should be captioned

16  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

17  shall be served and filed within ten days after service of the objections.  The parties are advised

18  that failure to file objections within the specified time may waive the right to appeal the District

19  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

20  DATED: July 14, 2005.

21

22

23  UNITED STATES MAGISTRATE JUDGE

24  008;liza1062.hc

25

26